**ALAN EISNER, State Bar # 127119**
**KESTENBAUM EISNER & GORIN LLP**
**14401 Sylvan Street, Suite 112**
**Van Nuys, CA 91401**
**Phone:        (818) 781-1570**
**Fax:            (818) 781-5033**
**E-mail:       ae@keglawyers.com**

**ERROL STAMBLER, State Bar # 58374**
**10880 Wilshire Blvd., Ste. 1050**
**Los Angeles, CA 90024**
**Phone:        (310) 473-4525**
**Fax:            (310) 475-8187**
**E-mail:       estambler@msn.com**

Attorney for Defendant
OYTUN MIHALIK

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR No. 11-00833(A)-JST |
| ) | |
| Plaintiff, ) | **DEFENDANT OYTUN** |
| ) | **MIHALIK'S SENTENCING** |
| ) | **MEMORANDUM; EXHIBITS** |
| v. ) | |
| ) | Sentencing Date: February 15, 2013 |
| OYTUN MIHALIK, ) | Time:  8:30 a.m. |
| ) | |
| Defendant. ) | Before the Honorable |
| ) | Josephine Staton Tucker |
| ) | |
| ) | **REDACTED VERSION** |
| ) | |
| _____ ) | |

        **TO THE HONORABLE JOSEPHINE STATON TUCKER, UNITED STATES DISTRICT COURT JUDGE AND TO UNITED STATES ATTORNEY ANDRÉ BIROTTE JR. AND ASSISTANT UNITED STATES ATTORNEY JUDITH A. HEINZ**:

        Defendant Oytun Mihalik, by and through her attorneys of record Alan Eisner and Errol Stambler, hereby files her Sentencing Memorandum and Exhibits.  Ms. Mihalik's position is based upon the factual basis to her plea, the Pre-sentence Report ("PSR"), the attached Sentencing Memorandum and Exhibits, and upon any oral

1   argument that may be presented at the time of the sentencing hearing pursuant to Federal

2   Rules of Criminal Procedure, Rule 32(c)(1).

3

4                                         Respectfully submitted

5                                         KESTENBAUM EISNER & GORIN LLP

6

7   Dated: February 5, 2013              _____/s/_____

8                                         ALAN EISNER
                                          Attorney for Defendant
9                                         OYTUN MIHALIK

10

11  Dated: February 5, 2013              _____/s/_____

12                                        ERROL STAMBLER
                                          Attorney for Defendant
13                                        OYTUN MIHALIK

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2

# TABLE OF CONTENTS

I.   STATEMENT OF THE CASE ………………………………………… 3

II.  AN APPLICATION OF TITLE 18 U.S.C. § 3553(A) FACTORS
     WARRANTS A SENTENCE OF 24 MONTHS …………………………… 5

     A.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
          SUPPORT A MITIGATED SENTENCE ………………………… 6

          1.   At The Time Of The Offense, Oytun Was Just Beginning A
               Separation From Her Husband ……………………………… 6

          2.   Immediately Following the Separation From Her Husband, Oytun
               Learned That Her Brother, With Whom She Was Extremely Close,
               Would Be Traveling On A Pilgrimage To
               Pakistan…………………………………………………… 7

          3.   Oytun Was Referred To The cihadmedia.com Website In
               Order To Contact Her Brother, Which Resulted In 31 Days   Of
               Activity, After Which She Voluntarily Terminated All Electronic
               Communications and Payments ………………… 8

     B.   THE HISTORY AND CHARACTERISTICS OF THE   DEFENDANT
          SUPPORT A MITIGATED SENTENCE…………… 10

     C.   OYTUN'S REQUESTED SENTENCE IS IN LINE WITH OTHER
          TERRORISM CASES INVOLVING SIMILAR OR MORE EGREGIOUS
          CONDUCT ……………………………………………… 13

     D    SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE
          SENTENCE IMPOSED ………………………………………… 15

          1.   THE SERIOUSNESS OF THE OFFENSE ………………… 16

          2.   THE NEED TO PROVIDE JUST PUNISHMENT………… 18

          3.   THE NEED TO PROTECT THE PUBLIC ………………… 19

          4.   THERE IS A LOW LIKLIHOOD OF RECIDIVISM ……… 19

III. CRIMINAL HISTORY CATEGORY …………………………………… 19

i



V.      CONCLUSION ........................................................................ 25

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I
### STATEMENT OF THE CASE

On August 29, 2011, defendant Oytun Mihalik was charged in a Criminal Complaint with making False Statements in violation of 18 U.S.C. §1001(a)(2).  The Complaint alleged that she provided false information regarding three money orders she sent to Pakistan, over a one month period, totaling $2,050 dollars.  On August 30, 2011 Ms. Mihalik was indicted on that same charge – the Indictment including the allegation that the false statements were made in a manner involving international terrorism as defined in 18 U.S.C. § 2331.  On December 21, 2011 the government filed a four count First Superseding Indictment.  Counts One through Three allege providing Material Support to Terrorists (one count for each money order sent), in violation of 18 U.S.C. § 2339A; Count Four alleges False Statements, in violation of 18 U.S.C. §1002(a)(2).

On August 10, 2012 Ms. Mihalik pled guilty pursuant to Plea Agreement.  Under that agreement, the parties stipulated to a base offense level of twenty-seven, pursuant to 2A2.1(a)(2); a 12-level adjustment under 3A1.4 for a crime intending to promote terrorism; and three-level reduction for acceptance of responsibility, pursuant to 3E1.1(a),(b), for a total offense level of 36.  The terrorism enhancement under 3A1.4 also increases a defendant's criminal history to level VI.  The plea agreement contemplates and states: "the defendant can argue that a variance from the otherwise applicable advisory guideline sentencing range is appropriate given consideration of relevant factors under 18 U.S.C. §3553(a) [and] argue that a downward departure from Criminal History Category VI is appropriate given the facts of this case.  (Plea Agreement, ¶¶ 16-18).

Probation similarly determines that the total offense level under the Guidelines is 36, with a Criminal History Category VI, and recommends a sentence of 180 months,

3

which is the 15-year statutory maximum for Count one, the count of conviction.[1]

The government has recommended a sentence of 12 years imprisonment, ████
████████████████████████████████████████████████████████
████████████████████████████

Defendant requests a sentence of 24-months.  Defendant recognizes that this sentence is substantially less than both the government and probation's recommendation. Defendant further recognizes that this crime is serious and the court's sentence must address the seriousness of the crime, respect for the law, and afford adequate deterrence. Nonetheless this case is particularly unique, and the offense was committed under unusual and mitigating circumstances.

Ms. Mihalik's total monetary contribution was $2,050 dollars.  She sent the money orders over a one-month period of time, when she had just been separated and living apart from her husband.  She stopped her support, and in fact stopped contact with the person whom she believed she was sending the money to, on her own, prior to detection and prior to intervention by law enforcement.  This one-month period was a tumultuous period in Ms. Mihalik's life.  Besides being recently separated from her husband, she had recently become aware that her mother may have lung cancer.  It was during this time that she was informed of her brother's pilgrimage to Pakistan, and was informed of a website where she could contact the group where he intended to travel. Through this website she began an email exchange with a person identifying himself as Ebu Bera,[2] and communicated with him in substantial part in an attempt to insure that her brother would be received and treated well at his destination.

Additionally, Ms. Mihalik's actions, despite the email exchanges with Ebu Bera, were not wholly ideologically motivated.  As evidenced by emails she sent just one year

---

[1]  The otherwise advisory guideline range is 324-404 months.
[2] Ebu Bera is the name he refers to himself as in the e-mail communications, but he is referred to by various names in the discovery including Ebu Bera and Zekeriya Cifti; the name he used to receive the payments from Oytun is Inayatullah or Natullah.

4

prior, she had also donated money to the Kurban Foundation, funds that went to support Turkish soldiers and their families – a group that would be philosophically opposed to the supposed group to whom she sent funds.

The actual destination of the funds and the actual use of the funds defendant sent is also unclear. Ebu Bera claimed at one time that the funds were needed to pay off a car, and at another time were used to fix his home, and yet at another time used for flood relief. A reading of the emails themselves reveals that Ms. Mihalik was being solicited, and even manipulated, by the person identifying himself as Ebu Bera. In sum, this woman who has lead an extremely law abiding life in her then 38 years, committed this crime under a unique and mitigating set of circumstances that this Court is asked to consider in imposing her sentence.

## II
## AN APPLICATION OF TITLE 18 U.S.C. § 3553(A) FACTORS WARRANTS A SENTENCE OF 24 MONTHS

The overriding principle and basic mandate of Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553(a)(2) which are:

    (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
    (b) deterrence;
    (c) incapacitation ("to protect the public from further crimes"); and
    (d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.)

The factors which this Court must consider pursuant to Title 18 U.S.C. § 3553(a) are the following:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed;
    (3) the kind of sentences available;
    (4) the sentencing range established for the applicable category of offense committed, including the (now non-mandatory) guideline range;
    (5) any pertinent policy statement issued by the Sentencing Commission;
    (6) the need to avoid unwarranted sentencing disparity; and
    (7) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1)-(7).

5

## A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A MITIGATED SENTENCE

Oytun has acknowledged her wrongdoing, ███████████████████
██████████████████████████████████ (*Exhibit A*).  She
has no criminal history prior to this case, either in the United States (*Id.*, ¶ 31), or in
Turkey (*Exhibit B*).

In her plea, Oytun has admitted to her e-mail exchange and sending funds to
Pakistan, as well as awareness that Ebu Bera was involved with an organization that was
associated with the Taliban.  However, an understanding of the circumstances in her life
prior to her one month e-mail communication with Ebu Bera, it is clear that Oytun was
not singularly motivated by a passionate radical ideology.  Oytun had even made
previous donations to the Turkish Armed Forces (***Exhibit C***), a military group opposed
to both Al-Qaeda and the Taliban.  As documented below, Oytun's month-long
aberrational conduct seems to have been more motivated by her own confused and
conflicted mental state and her love and anxiety about her brother Onur.

### 1. At The Time Of The Offense, Oytun Was Just Beginning A Separation From Her Husband

Oytun met her second and current husband, Errol, in 2007.  In discussing her
marriage with psychiatrist Dr. Richard Romanoff, Ph.D. (see Report of Dr. Romanoff –
*Exhibit D*; C.V. of Dr. Romanoff – *Exhibit E*)she described Errol as "financially
irresponsible, and … a heavy drinker, who became more verbally abusive when
intoxicated," all traits that she did not see in him until after they were married.  (*Exhibit
D*, p. 11).   Their marriage also encountered difficulties over Oytun's "efforts to become
pregnant through in vitro fertilization."  (*Id.*).  She explained to Dr. Romanoff that "this
was an extremely stressful and difficult period of time for her, and … she felt no support
at all from her husband."  (*Id.*).

Oytun "did eventually become pregnant, though she said, 'something bad
happened one day, I had some kind of allergic reaction.'  She said that she lost the

6

1    pregnancy, and felt completely ignored by Errol, describing this period of time as 'a

2    nightmare' for her." (*Id.*).

3           As the stress in the marriage continued, Ms. Mahalik finally "in December of

4    2010…decided to move out to her own apartment, 'for a trial separation.'" *Id.*  She

5    rented a place to stay at Homestead Suites, at 5990 Corporate Avenue, Cypress, CA

6    90630, as confirmed by Rick Orozco, an employee of Homestead Suites. (*Exhibit F*).

7           At this time, Oytun was also anxious about her mother's chronic cough which she

8    had noticed during her previous trip to Turkey. (*Exhibit A*.)  Oytun's worries would

9    unfortunately later prove justified as a pulmonary examination of her mother would

10   reveal a serious lung ailment. (*Exhibit G*).  A week after moving out from her husband,

11   and while dealing with these anxieties, she received a phone call from her brother Onur.

12   (*Exhibit D*, p. 11).

13

14           **2.     Immediately Following the Separation From Her Husband, Oytun**
                       **Learned That Her Brother, With Whom She Was Extremely Close,**
15                     **Would Be Traveling On A Pilgrimage To Pakistan.**

16           Oytun grew up with two older brothers, Onat, who was eight years older than her,

17   and Onur, who was four years older than her.  (*Exhibit D*, p. 5).  While Oytun was never

18   particularly close with Onat, her relationship with Onur was the opposite. (*Id,* p. 6).  In

19   discussions between her and Dr. Romanoff about her brothers, Dr. Romanoff even

20   noticed that "[h]er demeanor then changed dramatically when she began discussing her

21   middle brother Onur" after discussing Onat.  (*Id,* p. 6).  About Onur, Oytun stated that

22   "[h]e was always there for me, there's a lot of respect between us, he has a genius mind,

23   he never studies, but he's a genius…" (*Id.*, p. 7).

24           A week after the separation between Oytun and her husband began in December,

25   2010, Onur "called from Istanbul, telling her that he was also separating from his wife,

26   and then abruptly told her that he was planning to travel 'to Pakistan or some place, to

27   one of those areas where everyone is struggling,' in order to further his studies of

28   Islam." (*Id.*, p. 11).  Dr. Romanoff elaborates on the aftermath of this phone call:

                                                 7

1

"She said that upon hearing this information she was 'shocked and
2
devastated,' and 'I couldn't sleep for thirty-six hours, I called work, I said I
couldn't come in, I felt I'd lost my brother, that I'd never see him again, I
3
was crying.'  She again discussed how much she loved her brother and,
while crying during our session said, 'you have to understand, he's a great
4
person, he has a great mind, he's not like other people.'  Following up on
her above noted comment that her brother was traveling to this area in order
5
to pursue his religious studies she said, 'I've always wanted to understand
my brother's perspective, even though I can't, because he has a genius
6
mind, so I can't really understand, so I began exploring, why was he doing
this, I had no idea, I began listening to people on YouTube, I began
7
listening to courses on religion, on Islam, on Allah; my brother was sending
e-mails to me, he was calling me, he told me to tell my mother and father,
8
he was not calling his brother, who was there, but me, he was putting all the
burden on me, to tell our parents.'"

9
(*Id.*, p. 11-12).

10

11
       **3.**      **Oytun Was Referred To The cihadmedia.com Website In Order To
Contact Her Brother, Which Resulted In 31 Days Of Activity, After
Which She Voluntarily Terminated All Electronic Communications
12
and Payments**

13
       In a flurry of activity over the course of 31 days, from December 20, 2010, to

14
January 20, 2010, Oytun exchanged 33 e-mails with a man, Ebu Bera, whom she met

15
through a website which she was referred to after finding out her brother was travelling

16
to Pakistan.  (*Exhibit H*).   During those 31 days, she sent him three payments totaling

17
$2,050 ($750 on December 21, 2010; $600 on December 29, 2010; and $700 on January

18
11, 2011).  (*Id.*)  Following this flurry of activity, Oytun voluntarily ceased

19
communicating with the individual and ceased sending payments.

20
       The e-mails themselves raise more questions than answers.  It is not clear from

21
any of the e-mails who specifically is fighting, who is being fought, where the fighting is

22
occurring, and if fighting is even happening.  There is no mention of a specified enemy,

23
a specified location, or a specified plan.  While the e-mail communications do contain

24
references to "jihad," "infidels," and "mujadeen," none of the communications mention

25
any international type of attack or express any anti-American sentiment.  In fact,

26
America is never even mentioned in the e-mails other than Oytun's explaining the origin

27
of her cell phone number.  (*Exhibit H*, Bates 2387, E-mail No. 4.)

28

1    The purpose of the funds is equally unclear.  In an e-mail sent on January 9, 2011,
2  Ebu Bera mentions using the money sent by Oytun to buy "a car for the operations."
3  (*Exhibit H*, Bates 2375, E-mail No. 22.)  Ebu Bera does not provide any additional
4  information regarding these "operations."  Eleven days and ten e-mails later, the vehicle
5  debt was still being addressed in Oytun's final e-mail.  (*Exhibit H*, Bates 2373, E-mail
6  No. 33.)
7    When Ebu Bera was later interviewed, he explained to the FBI that he himself
8  was being used by an individual named Abdurraham, and he had only a dim recollection
9  of his communications with Oytun:



(*Exhibit I,* Bates 3308, 3310.)
20    Ebu Bera's bare remembrance of communications with Oytun strongly contrasts
21  the language used in the e-mails, in which Oytun is lavishly praised for her
22  contributions, with Ebu Bera even asking at one point if he can refer to Oytun as his
23  mother (in what must have been an emotionally powerful message to a woman whose
24  only pregnancy resulted in a miscarriage).  (*Exhibit H*, Bates 2375, E-mail No. 24.)  The
25  emotional impact of the e-mails was also clearly enhanced by the references to her
26  brother's arrival, with Ebu Bera expressing that he was "very delighted that [her brother
27  was] coming over here."  (*Exhibit H*, Bates 2387, E-mail No. 2.)
28    Given Oytun's state of mind at the time she initiated these communications, her

9

separation from her husband, her worries about her mother, and her worries about and interest in her brother's life, these e-mails, laden with praise and encouragement, found an easy prey.  After 31 days, however, Oytun snapped out of her lulled days, ceased all communication, and ceased sending payments.  Her bank records from Turkey provide further support that no further payments were made after this cessation.  (*Exhibit J*.)

When explaining her motivations to Dr. Romanoff, she acknowledged receiving "motivational vers[es] form the Koran" from Ebu Bera and that those verses "motivated me to donate, that I was loaning money to God, and I felt very good about giving, I mean spiritually, that's what I was feeling." (*Exhibit D*, p. 12.)  She continued, though, "I didn't want them to think that I was only checking on my brother, but I was hoping that through the money they'd make sure he was okay, that he'd be taken care of, so I sent money three times." (*Id.*)  When she "finally…received confirmation that her brother was actually there... 'I remember I was feeling so relieved, that he was safe." (*Id.*)

Oytun has since acknowledged her wrongdoing and expressed her apologies, writing to the Court:

> "The day that I plead guilty; looking around the courtroom, prosecutors, the American flag, everything seemed so surreal.  The reality of my great loss overwhelmed in my heart, and the seriousness of the crime made me feel very low, ashamed, and miserable in front of everybody.  That was my farewell to the country that I truly love very much.  I'm deeply sorry."

(*Exhibit A*.)

## B.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT A MITIGATED SENTENCE

Oytun was born in 1972 in Istanbul, Turkey.  (PSR, ¶ 36.)  As stated previously, she has no criminal history prior to this case, either in the United States (*Id.*, ¶ 31), or in Turkey (*Exhibit B*).  Her father, who is now 79 years old, works as a pharmacist, while her mother, who is now 69 years old, is a housewife.  (*Id.*, ¶ 36.)  Her oldest brother Onat is a medical doctor while her other brother Onur now "works in a plant manufacturing eye solutions for cataract surgeries." (*Id.*, ¶ 37.)

Oytun described herself growing up as "a bit above average" student who had "no history of any behavioral difficulties."  (*Exhibit D*, p. 7.)  She was particularly involved "in professional horseback riding, over a period of about ten years" that required six days of training per week.  (*Id.*, p. 9.)  Following in the footsteps of her father, she pursued a career as a pharmacist, obtaining degrees both in Turkey and the United States.  She graduated from the University of Istanbul in 1997, received a Master's Degree in Pharmaceutical Marketing and Healthcare Administration from Long Island University in 2002, obtained her National Pharmacy Equivalency Certification in 2003, became a registered pharmacist in New Jersey in 2005, received a California State Board of Pharmacy Diploma in 2006, and then obtained a limited license in New York from 2006 to 2009.  (*Exhibit K*; see PSR, ¶ 45-48.)

Oytun's employment history is exemplary.  She was employed as a pharmacist at CVS in Norwalk, CA from October 29, 2007, to January 23, 2011.  (*Exhibit L.*) Previously, she had worked as a pharmacist in stores both in Hemet, Banning, and San Bernardino, CA, from 2004 to 2007.  (PSR, ¶ 50.)  Prior to that, she had worked as a pharmacist at a Duane Reade Pharmacy in New York, NY from 2002 to 2005.  (PSR, ¶ 51.)  Although Oytun has been living in the United States for approximately fifteen years, she still makes an effort to maintain close relationships with her parents.  (PSR, ¶ 38.)

Oytun's motivation for sending the funds was not singular, but instead confused and conflicted.



1
2
3
4

5    (*Exhibit D*, p. 17.)

6        Those closest to her have written letters to the Court expressing their support

7    (*Exhibit M*).  Below are some extracts from those letters that highlight Oytun's caring

8    and respectful nature.

9        Melda Akin, Oytun's mother, writes:

10            "My daughter Oytun, by showing respect, affection and
     concern to her family all throughout her life has earned the love and
11   commendation of all of us and has acquired an unchangeable spot in our
     hearts and has become our lives spirits and life spring….
12            "Throughout her education duration she has attained
     (educational) achievements in the best schools and has been known as a
13   honest, help giver and studious student.  Not only in educational grounds,
     but also in social life she has been loved by her friends.  She has attained
14   (high) achievements throughout many years of (participation) in horse-
     riding sport.  She has adopted the modern Western life style but in the
15   same time was brought up as a young individual who has obtained the
     spiritual contemporary values….
16            "By obtaining the required education and career [(spelling
     edited)] achievements level both in Turkey and in the United States of
17   America, where she loves at least as much as she loves Turkey, my
     daughter has been our source of pride all the times."  (*Exhibit M*.)

18

19   Errol Mihalik, Oytun's husband, writes:

20            "I have never met such a remarkable individual and completely in
     love with her.  Every day, as human beings, we make small and at times
21   crucial mistakes that bestow on us regrets that may last days or even the
     rest of our lives.  I know my wife is pleading guilty for her charges, and her
22   actions pertaining to her charges are completely out of character….
             "Oytun is loyal, honest, considerate, and supportive wife who has
23   the ability to relate to others using another person's perspectives.  Her
     positive energy is refreshing, and it inspires me to better myself."  (*Exhibit
24   M*.)

25   Miriam Cervantes, a pharmacy technician who worked with Oytun, writes:

26            "She is always being pleasant, kind, and enthusiastic…She is a vey
     hard working person with a huge heart.  She is and always will be a very
27   important part of my life."  (*Exhibit M*.)

28

                                    12

**C.    OYTUN'S REQUESTED SENTENCE IS IN LINE WITH OTHER TERRORISM CASES INVOLVING SIMILAR OR MORE EGREGIOUS CONDUCT**

All terrorism cases are serious.  Nonetheless, courts have shown great discretion in imposing mitigated sentences and sentences far below the advisory guideline range when warranted.  In fact, mitigated sentences have been imposed where the conduct was much more committed, severe and threatening than in the instant case.  Following is a sampling of terrorism cases in which mitigated sentences or sentences substantially below the advisory guidelines were ordered:

| Case Name | Case Summary | Sentence |
|---|---|---|
| *Hamdan v. United States* 696 F.3d 1238, 1240 (D.C. Cir. 2012) (Note: District of Columbia Circuit recently vacated his conviction after determining that his conduct was not considered an offense during the relevant time period of 1996-2001) | Defendant was an Al Qaeda driver, who worked at Al Qaeda training camps, and eventually become the driver of and personal assistant to Osama Bin Laden. | 66 months |
| *United States v. Abdallah*, Case No. 2:08-cr-0094-NVW (Exhibit N) | Defendant participated in fundraising for designated terrorist organization Holy Land Foundaiton for Relief & Development and lied about his participation to the FBI. | 18 months |
| *United States v. Abdoulah*, Case No. 01CR3240-W (Exhibit O) | Defendant assisted the September 11, 2001, hijackers in arriving in San Diego. | Time Served (after about a year in custody) |
| *United States v. Abdow*, Case No. 09-292 JMR/SRN (Exhibit P) | Defendant obstructed FBI investigation into the recruitment of young men in the United States to train and fight for extremist groups in Somalia. | 4 months incarceration, 4 months house arrest |
| *United States v. Akl, et al.* Case No. 3:10CR251 (Exhibit Q) | Husband and Wife co-defendants were involved in scheme to send hundreds of thousands of dollars to the terrorist group Hizballah over the course of almost a year. | Husband: 75 months; Wife: 40 months |

13

| United States v. Ali<br>Case No. 02CR2912-L<br><br>United States v. Durrani<br>Case No. 02CR2912-L<br>(Exhibit R) | Co-defendants conspired to distribute heroin and hashish for the purpose of providing material support to terrorist group Al-Qaeda, and travelled internationally in support of that conspiracy. | 57 months each |
|---|---|---|
| United States v. Al-Arian<br>Case No. 8:03-CR-77-T-30TBM<br>(Exhibit S) | Defendant conspired to make or receive contribution of funds, goods or services to or for the benefit of the terrorist group Palestinian Islamic Jihad. | 57 months |
| United States v. Al-Hanooti<br>Case No. 08CR20083-1<br>(Exhibit T) | Defendant entered into an illegal business relationship for oil with Saddam Hussein's government. | 12 months and a day |
| United States v. Christianson,<br>586 F.3d 532 (7th Cir. 2009) | Two co-defendants who were member of the domestic eco-terrorist organization Earth Liberation Front committed $424,361 worth of damage at a facility belonging to the U.S. Forest Service. | 24 months and 36 months |
| United States v. Hupper<br>Case No. 1:08-cr-20410-PCH<br>(Exhibit U) | Defendant provided $20,000 to terrorist group Hamas and made a false passport application. | 46 months |
| United States v. Wright, et al.<br>Case No. 1:12-cr-00238-DDD<br>(Exhibit V) | Co-defendants conspired to bomb an Ohio bridge. | received 11 and a half years, other two co-defendants received 8 years each |

In a recent case, *United States v. Issa et al.*, Case No. 09CRIM1244, three men pled guilty to terrorism charges involving "a plot to move numerous shipments of cocaine across two continents to support Al Qaeda and two other terrorist organizations." (*Exhibit W*).  Prosecutors sought the maximum sentence of 15 years for each of the defendants.  (*Id.*)  Instead, "[t]wo defendants received about five years each, while the third received just 46 months."  (*Id.*)  Judge Barbara S. Jones, in explaining her reasoning, stated, "It seems clear to me that this defendant was not ideologically motivated….And this, to me, makes a difference…and is relevant to whether or not he is looking to commit further crimes and be a danger."  (*Id.*)

14

Oytun, meanwhile, was never actively involved in the supposed group that she sent money to.  Her conduct, while serious, was limited to three payments over a 31 day period, behavior that she voluntarily terminated before any detection by law enforcement. The specific organization she contacted is not listed on the United States' list of designated terrorist organizations.  Unlike many of the defendants in comparable cases, Oytun never travelled to another country to assist any terrorist organization, never participated in any attack, never even participated in the planning of any attack, never expressed any anti-American sentiment in her e-mail communications, and was not motivated by ideology.  As Federal District Judge Jones stated when sentencing individuals involved in shipping cocaine to support Al-Qaeda, the motive behind the conduct makes a big difference.  As discussed previously, Oytun's motivations were not ideological in nature.  Since her arrest, she has not made any ideological defense of any terrorist organization, and has even proclaimed in her letter to the Court her love for this country and all that it has offered her.  In comparison to the above-cited cases, where defendant's conduct occurred over many months, involved active participation in terrorism activities, and involved material support of known terrorist organizations in substantial amounts, Oytun's conduct is significantly less severe.  This Court is asked to consider the comparative conduct and sentences in the cases noted above.

## D.    SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED

The next factors under §3553(a) concern the need for a particular sentence.  The mandatory principle of §3553(a) is a limiting one: the sentence must be "*sufficient, but not greater than necessary*,"[3] to satisfy:

> (2) the need for the sentence imposed - - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to

---

[3] The *Adelson* court noted "necessary is the operative word.  *Adelson*, 441 F.Supp. 2d at 515.

provide defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2)(emphasis added).

Courts across the country have recognized that they must honor this parsimonious provision.  See.e.g., *Carty*, 520 F.3d at 991; *United States v. Spigner*, 416 F.3d 708, 711 (8th Cir. 2005).

### 1.       THE SERIOUSNESS OF THE OFFENSE

Certainly a crime that poses a potential threat of harm to our country, or injury to our military or persons who represent our country, is indeed the most serious of crimes. Neither the defense nor defendant herself will minimize the severity of crime at issue. However, as discussed previously, several extraordinary factors are relevant in determining the seriousness of this offense.

Oytun's total monetary contribution to Ebu Bera was $2,050.  This is not a significant sum.  The funds were sent on three (3) occasions during only a one-month period of time.  Oytun's conduct was thus limited in duration.  Also, Oytun did not send any addition funds after January 2011.  The record shows no further criminal conduct after that date.  Oytun therefore stopped her participation on her own, without intervention from law enforcement.

Oytun participated in the offense at a vulnerable period in her life.  She had separated from her husband at this time and had move out of their home.  She had recently returned from Turkey where it became apparent that her mother was ill and may have had lung cancer.  She was informed that her brother was making a pilgrimage to Pakistan from Turkey during this time.  She has a close relationship with her brother and was concerned for his safety.  She was directed by Kerim (her close friend in Turkey and her brother's business partner) to the specific website in order to contact a person or persons in the group in Pakistan where she was advised that her brother was traveling.

Oytun sent these funds and communicated with Ebu Bera, at least in part, to assist

16

her brother in traveling safely and so her brother would be treated well at his destination. Oytun writes: "I am getting in contact with you through my brother… who is now on the road to be able to come to you (Bates 2388, E-mail No. 1); My brother is on the road at this time, he is coming to join you (Bates 2387, E-mail No. 2); I presume my brother hasn't arrived there yet (Bates 2383, E-mail No. 10); My brother is on the way, he will come to be with you, god willing, but I suppose he hasn't arrived yet (Bates 2374, E-mail No. 29)." (*Exhibit H*.)

It is unclear how the funds that Oytun send were used, but it is apparent they were not used for violent purposes. In the email communication Ebu Bera states that the funds were needed to buy some things for his house (*Exhibit H*, Bates 2382), and at another point he states he must pay off a car that he had purchased. (*Exhibit H*, Bates 2373) In his statement to authorities, Ebu Bera states that the money Oytun sent was used for flood relief. (*Exhibit H*, Bates 3310). In her emails Oytun also discusses providing medication, and the fact that her family has a pharmacy, indicating a desire to help sick people in the area. (*Exhibit H*, Bates 2387-88).

Ebu Bera uses dramatic and emotional language in his email conversations, and it is clear that Oytun is being solicited by the use of religion, the quotation of Koran verses, and by appeals of emotion and desperation by Ebu Bera: "Dear mother, there is a debt for this car of mine. The man is distressing me. Continually asking me what happened to his money. Actually I bought this car relying on a brother, because he said he will give me money. As I soon as I bought the car, now the man does not answer my calls and mails. Is that how far humanity goes? ... I will either give the car back or a door needs to open for me to find relief regarding financial matter. Mother, I love you. Mother, take care…" Ebu Bera addresses Oytun as "mother" in an obvious appeal to pry on her emotions, which she responds to due to her vulnerable state. Oytun is obviously being solicited.

Though the crime at issue is indeed serious, this Court is asked to consider the amount of Oytun's financial support, the limited time period of her conduct, and the fact

17

1  that she ceased the conduct on her own prior to it being found out by law enforcement.

2  Oytun's emotional state at the time of her actions, her relationship with her brother and

3  fear for his safety, are all circumstances to be considered.

4

5                    **2.       THE NEED TO PROVIDE JUST PUNISHMENT**

6          18 U.S.C. §3553 mandates that the court consider the need for the sentence

7  imposed ot provide just punishment for the offense. 18 U.S.C. §3553(a)(2)(a).  In order

8  to determine whether a punishment is "just," a number of factors need to be considered.

9  A "just" punishment is punishment that fits the crime."  *Simon v United States*, 361 F.

10  Supp. 2d 35, 43 (E.D. New York 2005).  The punishment should not be unreasonably

11  harsh under all of the circumstances of the case.  *See United States v. Wilson*, 350

12  F.Supp. 2d 910 (D. Utah 2005)(citing S. Rep. 98-255, 1984 U.S.C.C.A.N. 3182, 3258-

13  59).  Certainly, a defendant can be punished by means other than incarceration.

14          In the instant case, Oytun has been in custody since August 2011 – a total of 18

15  months.  Along with her guilty plea she agreed to judicial removal from the United

16  States, an action that renders her permanently inadmissible to the United States.  This is

17  the country where she has lawfully resided for the past 18½ years.  She went to graduate

18  school and obtained her professional degree here, learned and practiced her profession

19  here, paid taxes here, got married here and led a lawful life here.  In her letter to the

20  court Oytun acknowledges the magnitude of her loss:

21          "I know I did wrong.  Everything that I worked for; 16 years of my crime-
           free, honest living, all of my accomplishments and my dreams are swept
22         away as a result of my actions during a very emotionally disturbed period.
           I'm facing very harsh consequences such as losing my residency, my three
23         pharmacy state licenses that I worked very hard to get, the opportunity to
           raise my children in this country and contributing to the community
24         through my hard work as a pharmacist at CVS."  (*Exhibit A.*)

25

26          As Oytun recognizes more than anyone, here conviction in this case will cost her

27  more than just her liberty.

28

                                                  18

### 3.     THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant.  As noted above, Oytun's entire history, and the cooperative efforts she has taken since the commencement of the case, show that society needs no protection from Oytun.  She will no longer reside in the United States, and will no longer be allowed to travel here.  Thus, there is no risk of future danger to society.

### 4.     THERE IS A LOW LIKLIHOOD OF RECIDIVISM

Oytun's conduct was limited to a flurry of activity over a 31 day period.  She terminated her offensive conduct of her own volition prior to any detection by law enforcement.  Once she ceased the payments and e-mails, she never resumed.

As Oytun's motives were not ideological, but stemmed from the circumstances of her life, it is highly unlikely that Oytun will again commit a similar offense.  Oytun has spent her life pursuing her education and her career as a pharmacist.  Prior to this case, she had no criminal history.  It is clear that her conduct in this case was an aberration that is unlikely to repeat itself.

### III
### DEFENDANT'S CRIMINAL HISTORY CATEGORY IS OVERSTATED

Under USSG. § 3A1.4, Oytun's Criminal History Category is automatically "VI" as a result of her offense.  U.S.S.G. § 4A1.3(b)(1), however, provides that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."  U.S.S.G. § 4A1.3(b)(1).

The automatic increase in defendant's criminal history level under USSG § 3A1.4 is not appropriate in certain cases.  In *United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008), the defendant was convicted of making false declarations and statements regarding

his attendance of a jihadist training camp and firing weapons at the camp, and for obstructing justice with his false statements. *Id.* at 305. The district court found that the terrorism enhancement applied, yielding a guideline range of 210 to 262 months. *Id.* "But the court thought the case called for a downward departure under § 4A1.3 or (in the alternative) a variance under 18 U.S.C. § 3553(a). 'Sabri Benkahla is not a terrorist,' the court stated. [Citation.] He 'has not committed any other criminal acts' and his likelihood of doing so upon release is 'infinitesimal.' ....The court thus treated Benkahla as having a Category I criminal history and sentenced him to 121 months." *Id.* at 305-306. The Fourth Circuit affirmed the sentence.

Like the defendant in *Benkahla*, Oytun has not committed any other criminal acts, either in the United States (PSR, ¶ 31), or in Turkey (*Exhibit B*), and is unlikely to do so in the future. The facts of this case and Oytun's personal history make this case particularly appropriate for a downward departure to Criminal History Category I.











24



**V**
**CONCLUSION**

The offense committed by Oytun in this case is serious, and she has acknowledged that seriousness in her letter to the Court.  As has been discussed throughout this memorandum, however, her conduct was nevertheless limited both in scope and duration.  The e-mail communications lasted only 31 days, before she voluntarily terminated them, and her material support was limited to three payments totaling $2,050.  The circumstances that led Oytun to commit this offense were not so much ideological in nature, as much as her dealing with the anxieties of her separation from her husband, her mother's illness, and her brother making this dangerous trip to

Pakistan.  Her motivation for sending the funds were mixed, confused and conflicted.

Oytun has shown no propensity towards criminal conduct and in fact, led an entirely

law abiding life prior to this offense.  She has tried to make amends through her guilty

plea, her remorseful letter to the court, ████████████████████████████████.  She

is not likely to offend in the future.  She has and will continue to suffer greatly for her

conduct, even if only by her eventual deportation from the United States, the country

that she had lived in her entire adult life and had come to love.  For the reasons set

forth in this memorandum, the defense respectfully requests that this Court impose a

sentence of 24 months incarceration.

Respectfully submitted

KESTENBAUM EISNER & GORIN LLP

Dated: February 5, 2013          _____/s/_____

ALAN EISNER
Attorney for Defendant
OYTUN MIHALIK

Dated: February 5, 2013          _____/s/_____

ERROL STAMBLER
Attorney for Defendant
OYTUN MIHALIK

1

## TABLE OF EXHIBITS

2  Exhibit A ……………………………...          Oytun's Letter to the Court

3  Exhibit B ……………………………...          Oytun's Criminal History from Turkey

4  Exhibit C ……………………………...          ██████████████████████████████

5  Exhibit D ……………………………...          ████████████████

6  Exhibit E ……………………………...          Dr. Romanoff CV

7  Exhibit F ……………………………...          Interview of Rick Orozco

8  Exhibit G ……………………………...          Oytun's Mother's Medical Report

9  Exhibit H ……………………………...          ███████████████████████

10 Exhibit I ……………………………...          ██████████████████████

11 Exhibit J ……………………………...          █████████████████████████████

12 Exhibit K ……………………………...          Oytun's Degrees and Licenses

13 Exhibit L ……………………………...          Oytun's CVS employment

14 Exhibit M ……………………………...          Letters of Support

15 Exhibit N ……………………………...          *United States v. Abdallah,*

16 Exhibit O ……………………………...          *United States v. Abdoulah,*

17 Exhibit P ……………………………...          *United States v. Abdow,*

18 Exhibit Q ……………………………...          *United States v. Akl, et al.*

19 Exhibit R ……………………………...          *United States v. Ali / Durrani*

20 Exhibit S ……………………………...          *United States v. Al-Arian*

21 Exhibit T ……………………………...          *United States v. Al-Hanooti*

22 Exhibit U ……………………………...          *United States v. Hupper*

23 Exhibit V ……………………………...          *United States v. Wright, et al.*

24 Exhibit W ……………………………...          *United States v. Issa et al.*

25 Exhibit X ……………………………...          ████████████████████

26 Exhibit Y ……………………………...          ██████████████████████

27 Exhibit Z ……………………………...          ████████████████████

28