1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   PATRICK R. FITZGERALD (CA Bar Number: 135512)
4  Assistant United States Attorney
   Chief, National Security Section
5  JUDITH A. HEINZ (CA Bar Number: 176264)
   Assistant United States Attorney
6  Deputy Chief, National Security Section
        1300 United States Courthouse
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone: (213) 894-4591/7280
        Facsimile: (213) 894-6436
9       Email: patrick.fitzgerald@usdoj.gov
               judith.heinz@usdoj.gov
10
   Attorneys for Plaintiff
11 United States of America

12                  UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                      SOUTHERN DIVISION

15

16 UNITED STATES OF AMERICA,        ) Case No.  CR 11-833(A)-JST
                                    )
17              Plaintiff,          ) GOVERNMENT'S RESPONSE TO
                                    ) DEFENDANT'S SENTENCING
18         v.                       ) MEMORANDUM
                                    )
19 OYTUN AYSE MIHALIK,              ) REDACTED VERSION
      aka Ayse Oytun Akin,          )
20    aka Ayse Mihalik,             ) Sentencing: March 29, 2013
      aka "Cindy Palmer,"           )              8:30 a.m.
21                                  )
              Defendant.            )
22                                  )
                                    )
23

24      Plaintiff, United States of America, by and through its

25 counsel of record, the United States Attorney for the Central

26 District of California, hereby responds to the sentencing

27 memorandum of defendant Oytun Ayse Mihalik, aka Ayse Oytun Akin,

28 aka Ayse Mihalik, aka "Cindy Palmer" ("defendant").  Defendant

1  seeks a sentence of 24 months imprisonment, based on defendant's

2  claims that her criminal conduct was aberrant and the

3  circumstances of her case are "particularly unique." Defendant

4  argues that she sent but a small amount of money to Ebu Bera,

5  over a short period of time, when she was unusually vulnerable to

6  Ebu Bera's manipulation. Defendant argues that her motivation to

7  communicate with Ebu Bera was to try to insure that her brother,

8  who was "on a pilgrimage" to Pakistan, would be treated well at

9  his destination. Defendant argues that her sending of money to

10  Ebu Bera was not ideologically motivated because one year earlier

11  she made a donation to a charity for Turkish soldiers.

12       Defendant's arguments are soundly refuted by the evidence

13  summarized below ███████████████████████████████████. These

14  establish that defendant's provision of support for terrorism was

15  knowing and intentional -- not the product of undue influence or

16  misguided good intentions, and not aberrant conduct. In fact, as

17  defendant herself told the FBI shortly after her arrest, she

18  believed Ebu Yasir was a member of the Taliban and Al Qaeda and

19  she knew he was using her money for mujahadin operations against

20  the American military forces in the Afghanistan/Pakistan region,

21  but this was about "beliefs," and defendant believed sending

22  money to Ebu Yasir was right because it would keep her in Allah's

23  good graces. Gov's Exh. A, at 163-164 (attached).

24  **A.   Defendant's Criminal Conduct Was Not An Aberration**

25       After living in the United States for several years,

26  defendant visited her home in Turkey from October 18, 2010, to

27

28

November 7, 2010.  Def's Mem., Exh. D, at 3.[1]  While in Turkey,
defendant became involved with another man, Ahmet Kerim Uzbasan
("Kerim")[2] and adopted a "new religiousness."  See Def's Mem.,
Exh. D, at 2; ████████████████████████████████████.  Defendant's
mind-set during that time is apparent from ███████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████[3]  When defendant
returned to the United States in November 2010, she informed her
husband, Errol, that she wanted a divorce.  Def's Mem., Exh. D,
at 14.  To Errol, it appeared that defendant had embraced Islam
while in Turkey, and that in contrast to her earlier behavior,
upon her return to the United States, she was far more observant
in her religion and she would become upset with "the West."
Def's Mem., Exh. D, at 15.  Errol became increasingly concerned
that defendant was "falling toward a more radical interpretation"
of Islam.  Id.  In fact, Errol was so concerned that he called
the Department of Homeland Security and reported that when he
asked defendant "do you want to harm someone here?" defendant

_____

[1] "Def's Mem." refers to defendant's sentencing memorandum,
followed by the exhibit letter designation and internal page
number within the exhibit as applicable.

[2] Defendant would continue this relationship until after
her arrest in this case.

[3] Although defendant made a donation to a Turkish Armed
Forces charity in November 2009, this act pre-dates her apparent
embrace of Islamic extremism.

3

1  looked at him and said, "If I have to kill people for Allah, I
2  will."  Gov't Exh. B, at 5 (attached).
3      In December 2010, defendant moved to an extended stay
4  residence, certain that she wanted to divorce Errol.  Def's Mem.,
5  Exh. D, at 11.





Thus, defendant's initial e-mail communication to Ebu Bera stemmed from her desire to participate in jihad like her brother Onur – not merely from emotional distress or concern about Onur's well-being.

Defendant continued to communicate with Ebu Yasir. See Def.'s Mem., Exh. H. █████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████  Thus, defendant knew that the money she sent – a total of $2050 – was more than enough to finance an entire operation against United States military forces.

On February 11, 2011, defendant returned to Turkey. It was Errol's understanding that defendant actively intended to divorce him. Def's Mem., Exh. D, at 14. On March 21, 2011, while in Turkey, defendant sent $2,850 to Ebu Yasir in Pakistan. Gov't Exh. D. Although the money was intended for Onur, so he could return to Turkey, defendant understood that it was being sent to Ebu Yasir's group. Gov't Exh. A, at 163 (attached). When

_____

[4] ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

defendant sent the money, she believed that Ebu Yasir was still with Al Qaeda, the Taliban, and was fighting jihad against the United States military. Id.[5] Sometime in March or April 2011, Kerim told defendant to watch out and be careful because Ebu Yasir was under investigation in Pakistan. Id. Defendant believed Ebu Yasir was under investigation because she knew he was involved in terrorist activities in Pakistan. Id.

Defendant returned to the United States on August 8, 2011. Her laptop computer was imaged at the airport; on it law enforcement found a "favorite" tab for "The Al Qaeda Manual," that the user had viewed the Al Qaeda Manual several times, and that the user had conducted searches for "true jihad" and "Jihad in Afghanistan" in "privacy" mode. Gov't Exh. E. It was Errol's belief that defendant returned to the United States only to maintain her green card status. Def's Mem., Exh. D, at 14. On August 26, 2011, defendant went to Los Angeles International airport, where she attempted to board a flight to return to Turkey. Defendant had told Errol that she could not take the oath of allegiance to become a United States citizen, characterizing this oath as "a blasphemy," and "a mistake against my religion." Def's Mem., Exh. D, at 2-3. The FBI arrested defendant at the airport.

The FBI interviewed defendant on August 26, 27, and 28, 2011. Defendant made admissions ███████████████████████ ███████████████████████████. At no time during these interviews did defendant indicate in any way that she sent money

---

[5] ████████████████████████████████████████████████
████████████████████████████████████████████████████

to Ebu Yasir due to a mistake, confusion, emotional stress, or undue influence.  To the contrary, she stated repeatedly and with great conviction that she sent the money to Ebu Yasir, knowing that he intended to use it for mujahedin operations against United States military forces in the Afghanistan/Pakistan region, because sending money to Ebu Yasir was right because it would keep her in Allah's good graces.  Gov's Exh. A, at 163-164.

**B.    Defendant's Other Arguments Do Not Support A Reduced Sentence**

Defendant's additional arguments do not justify the 24-month sentence she seeks.  Defendant argues that the application of sentencing guideline section 3A1.4 (the terrorism adjustment) causes defendant's criminal history category to be overstated.  However, unlike the defendant in the Benkahla case relied upon by defendant, here, defendant stands convicted of providing material support to terrorists – a quintessential terrorism offense - rather than making false statements.  Moreover, because the statutory maximum sentence here is far below the advisory sentencing guideline range (324-404 months), the application of the higher criminal history category is warranted.

Defendant argues that the 24-month sentence requested by defendant is in line with other terrorism cases.  It is impossible to evaluate, however, why the sentences presented by defendant were imposed, because sentences often are based on factors not apparent in the public record.  This is why the sentencing guidelines are the starting point and continuing touchstone for all sentences.  See United States v. Ressam, 679 F.3d 1069, 1089 (9th Cir. 2012) (the court must ensure that the

justification is sufficiently compelling to support the degree of the variance).   Defendant's suggested radical departure from the advisory guideline sentence is not justified here.

DATED: February 8, 2013

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Section

/s/
JUDITH A. HEINZ
Assistant United States Attorney
Deputy Chief,
National Security Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1                               EXHIBITS

2

3   Exhibit A:        Federal Bureau of Investigation report of post-

4                     arrest interview of Oytun Ayse Mihalik on August

5                     29, 2011

6

7   Exhibit B:        Partial transcript of Errol Mihalik's telephone

8                     call on December 27, 2010, to the Homeland

9                     Security Investigations tip line (a disc

10                    containing the full recorded call is also

11                    attached)

12

13  Exhibit C:        ██████████████████████████████████████████████

14                    ██████████████████████████████████████████████

15                    ████████████████████████████████

16

17  Exhibit D:        Western Union record of a money transfer on March

18                    21, 2011, from defendant to a recipient in

19                    Pakistan

20

21  Exhibit E:        List of some material found during a search of

22                    defendant's laptop computer on August 8, 2011, at

23                    Los Angeles International Airport

24

25

26

27

28