ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
PATRICK R. FITZGERALD (CA Bar Number: 135512)
Assistant United States Attorney
Chief, National Security Section
JUDITH A. HEINZ (CA Bar Number: 176264)
Assistant United States Attorney
Deputy Chief, National Security Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4591/7280
    Facsimile: (213) 894-6436
    Email: patrick.fitzgerald@usdoj.gov
           judith.heinz@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR 11-833(A)-JST |
| Plaintiff, | ) |
| | ) GOVERNMENT'S RESPONSE TO |
| v. | ) DEFENDANT'S SENTENCING |
| | ) MEMORANDUM |
| OYTUN AYSE MIHALIK, | ) |
|   aka Ayse Oytun Akin, | ) **REDACTED VERSION** |
|   aka Ayse Mihalik, | ) |
|   aka "Cindy Palmer," | ) Sentencing: March 29, 2013 |
| | )              8:30 a.m. |
| Defendant. | ) |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby responds to the sentencing memorandum of defendant Oytun Ayse Mihalik, aka Ayse Oytun Akin, aka Ayse Mihalik, aka "Cindy Palmer" ("defendant"). Defendant

seeks a sentence of 24 months imprisonment, based on defendant's claims that her criminal conduct was aberrant and the circumstances of her case are "particularly unique." Defendant argues that she sent but a small amount of money to Ebu Bera, over a short period of time, when she was unusually vulnerable to Ebu Bera's manipulation. Defendant argues that her motivation to communicate with Ebu Bera was to try to insure that her brother, who was "on a pilgrimage" to Pakistan, would be treated well at his destination. Defendant argues that her sending of money to Ebu Bera was not ideologically motivated because one year earlier she made a donation to a charity for Turkish soldiers.

Defendant's arguments are soundly refuted by the evidence summarized below ███████████████████████████. These establish that defendant's provision of support for terrorism was knowing and intentional -- not the product of undue influence or misguided good intentions, and not aberrant conduct. In fact, as defendant herself told the FBI shortly after her arrest, she believed Ebu Yasir was a member of the Taliban and Al Qaeda and she knew he was using her money for mujahadin operations against the American military forces in the Afghanistan/Pakistan region, but this was about "beliefs," and defendant believed sending money to Ebu Yasir was right because it would keep her in Allah's good graces. Gov's Exh. A, at 163-164 (attached).

A. Defendant's Criminal Conduct Was Not An Aberration

After living in the United States for several years, defendant visited her home in Turkey from October 18, 2010, to

1  November 7, 2010. Def's Mem., Exh. D, at 3.[1] While in Turkey,
2  defendant became involved with another man, Ahmet Kerim Uzbasan
3  ("Kerim")[2] and adopted a "new religiousness." See Def's Mem.,
4  Exh. D, at 2; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Defendant's
5  mind-set during that time is apparent from ▓▓▓▓▓▓▓▓▓▓▓▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[3] When defendant
12 returned to the United States in November 2010, she informed her
13 husband, Errol, that she wanted a divorce. Def's Mem., Exh. D,
14 at 14. To Errol, it appeared that defendant had embraced Islam
15 while in Turkey, and that in contrast to her earlier behavior,
16 upon her return to the United States, she was far more observant
17 in her religion and she would become upset with "the West."
18 Def's Mem., Exh. D, at 15. Errol became increasingly concerned
19 that defendant was "falling toward a more radical interpretation"
20 of Islam. Id. In fact, Errol was so concerned that he called
21 the Department of Homeland Security and reported that when he
22 asked defendant "do you want to harm someone here?" defendant

---

[1] "Def's Mem." refers to defendant's sentencing memorandum, followed by the exhibit letter designation and internal page number within the exhibit as applicable.

[2] Defendant would continue this relationship until after her arrest in this case.

[3] Although defendant made a donation to a Turkish Armed Forces charity in November 2009, this act pre-dates her apparent embrace of Islamic extremism.

1  looked at him and said, "If I have to kill people for Allah, I
2  will." Gov't Exh. B, at 5 (attached).
3      In December 2010, defendant moved to an extended stay
4  residence, certain that she wanted to divorce Errol. Def's Mem.,
5  Exh. D, at 11. ████████████████████████████████
6  ████████████████████████████████████████████████
7  ████████████████████████████████████████████
8  ████████████████████████████████████████████████
9  ████████████████████████████████████████████████
10 ████ ██████████████████████████████████████████████
11 ████████████████████████████████████████████████
12 ████████████████████████████████████████████████
13 ████████████████████████████████████████████████
14 ████████████████████████████████████████████████
15 ██████████████████████ ████████████████████████
16 ████████████████████████████████████████████████
17 ████████████████████████████████████████████████
18 ████ ████████████████████████████████████████████
19 ████████████████████████████████████████████████
20 ████████████████████████████████████████████████
21 ██████████████████████████████████████████████
22 ████████████████████ ██████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████
25 ████████████████████████████████████████████████
26 ████████████████████
27 ████████████████████████████████████████████████
28 ████████████████████████████████████████████████

4



1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5 [redacted] [4]
6 Thus, defendant's initial e-mail communication to Ebu Bera
7 stemmed from her desire to participate in jihad like her brother
8 Onur – not merely from emotional distress or concern about Onur's
9 well-being.
10     Defendant continued to communicate with Ebu Yasir. See
11 Def.'s Mem., Exh. H. [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted] Thus, defendant knew that the money she sent –
17 a total of $2050 – was more than enough to finance an entire
18 operation against United States military forces.
19     On February 11, 2011, defendant returned to Turkey. It was
20 Errol's understanding that defendant actively intended to divorce
21 him. Def's Mem., Exh. D, at 14. On March 21, 2011, while in
22 Turkey, defendant sent $2,850 to Ebu Yasir in Pakistan. Gov't
23 Exh. D. Although the money was intended for Onur, so he could
24 return to Turkey, defendant understood that it was being sent to
25 Ebu Yasir's group. Gov't Exh. A, at 163 (attached). When

---

[4] [redacted]

defendant sent the money, she believed that Ebu Yasir was still with Al Qaeda, the Taliban, and was fighting jihad against the United States military. Id.[5] Sometime in March or April 2011, Kerim told defendant to watch out and be careful because Ebu Yasir was under investigation in Pakistan. Id. Defendant believed Ebu Yasir was under investigation because she knew he was involved in terrorist activities in Pakistan. Id.

Defendant returned to the United States on August 8, 2011. Her laptop computer was imaged at the airport; on it law enforcement found a "favorite" tab for "The Al Qaeda Manual," that the user had viewed the Al Qaeda Manual several times, and that the user had conducted searches for "true jihad" and "Jihad in Afghanistan" in "privacy" mode. Gov't Exh. E. It was Errol's belief that defendant returned to the United States only to maintain her green card status. Def's Mem., Exh. D, at 14. On August 26, 2011, defendant went to Los Angeles International airport, where she attempted to board a flight to return to Turkey. Defendant had told Errol that she could not take the oath of allegiance to become a United States citizen, characterizing this oath as "a blasphemy," and "a mistake against my religion." Def's Mem., Exh. D, at 2-3. The FBI arrested defendant at the airport.

The FBI interviewed defendant on August 26, 27, and 28, 2011. Defendant made admissions ███████████████ ███████████████████████████. At no time during these interviews did defendant indicate in any way that she sent money

---

[5] ███████████████████████████████████████████████

to Ebu Yasir due to a mistake, confusion, emotional stress, or undue influence. To the contrary, she stated repeatedly and with great conviction that she sent the money to Ebu Yasir, knowing that he intended to use it for mujahedin operations against United States military forces in the Afghanistan/Pakistan region, because sending money to Ebu Yasir was right because it would keep her in Allah's good graces. Gov's Exh. A, at 163-164.

### B. Defendant's Other Arguments Do Not Support A Reduced Sentence

Defendant's additional arguments do not justify the 24-month sentence she seeks. Defendant argues that the application of sentencing guideline section 3A1.4 (the terrorism adjustment) causes defendant's criminal history category to be overstated. However, unlike the defendant in the Benkahla case relied upon by defendant, here, defendant stands convicted of providing material support to terrorists - a quintessential terrorism offense - rather than making false statements. Moreover, because the statutory maximum sentence here is far below the advisory sentencing guideline range (324-404 months), the application of the higher criminal history category is warranted.

Defendant argues that the 24-month sentence requested by defendant is in line with other terrorism cases. It is impossible to evaluate, however, why the sentences presented by defendant were imposed, because sentences often are based on factors not apparent in the public record. This is why the sentencing guidelines are the starting point and continuing touchstone for all sentences. See United States v. Ressam, 679 F.3d 1069, 1089 (9th Cir. 2012) (the court must ensure that the

justification is sufficiently compelling to support the degree of the variance). Defendant's suggested radical departure from the advisory guideline sentence is not justified here.

[REDACTED]

DATED: February 8, 2013

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Section

/S/
_____
JUDITH A. HEINZ
Assistant United States Attorney
Deputy Chief,
National Security Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**EXHIBITS**

Exhibit A:   Federal Bureau of Investigation report of post-arrest interview of Oytun Ayse Mihalik on August 29, 2011

Exhibit B:   Partial transcript of Errol Mihalik's telephone call on December 27, 2010, to the Homeland Security Investigations tip line (a disc containing the full recorded call is also attached)

Exhibit C:   [REDACTED]

Exhibit D:   Western Union record of a money transfer on March 21, 2011, from defendant to a recipient in Pakistan

Exhibit E:   List of some material found during a search of defendant's laptop computer on August 8, 2011, at Los Angeles International Airport